UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

TIMOTHY TOM, JR.
ON BEHALF OF HIMSELF AND ALL
OTHERS SIMILARLY SITUATED,

       Plaintiff,

v.

GENERAC POWER SYSTEMS, INC.,

       Defendant.

Case No. 17-CV-1413

## DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION AND AUTHORIZATION OF NOTICE TO SIMILARLY-SITUATED PERSONS

### INTRODUCTION

The named Plaintiff Timothy Tom, Jr., with declarations from himself and two other opt-in plaintiffs, seeks to conditionally certify employees in 38 different job classifications in five municipalities across the State of Wisconsin. Even ignoring employee turnover that has occurred during the limitations period, that group includes 1,243 current employees, who are currently supervised by more than 24 different individuals. Collectively, this group was paid approximately 263,000 hours – over $8M – of overtime, in 2017 alone. As the basis for Plaintiff's request, he asserts that Generac has an unlawful "rounding" policy that always works to the detriment of the individuals he seeks to represent. Of course, fact and allegation are not always the same.

Contrary to Plaintiff's allegations, Generac utilizes a lawful grace period, not an unlawful one-way rounding practice. As the regulations implementing the FLSA make clear, "[i]n those

cases where time clocks are used, employees who voluntarily come in before their regular starting time or remain after their closing time, do not have to be paid for such periods provided, of course, that they do not engage in any work." 29 C.F.R. § 785.48(a). That regulation then endorses the very practice at issue here: "[E]arly or late clock punching may be disregarded." *Id.* Again, there is nothing inherently unlawful about Generac's time clock practices.

As important, the alleged conduct giving rise to Plaintiff's claims – i.e., working without pay – is a clear violation of Generac's established policies, as he acknowledged during his deposition:

> Q:     Do you remember when we reviewed the overtime policy and we agreed that the policy prohibits working hours off the clock without getting paid for them?
>
> A:     Yes.
>
> Q:     Would you agree that this is a violation of company policy?
>
> A:     Yes.

(May 15, 2018 Deposition of Timothy Tom, Jr. 104:23 – 105:5 (hereinafter "Tom. Dep. Tr.").)[1] When asked if anyone told him to work extra hours, he said no. (Tom Dep. Tr. 106:3-7.) When asked if his supervisor knew he was working extra hours, he said he didn't know what his supervisor knew. (Tom Dep. Tr. 106:23-107:19.) In fact, the named Plaintiff testified that he routinely asked his supervisor for permission to work extra hours, which requests his supervisor always approved. (Tom Dep. Tr. 82:4-11.) However, he did not do so with respect to the time at issue in this case. When asked if he ever reported to his supervisor, to payroll, or to human resources that he believed he had worked without pay, or that there was an error in his pay, he

---

[1] Excerpt pages from the May 15, 2018 Deposition of Timothy Tom, Jr. are marked and attached as Exhibit A to the June 11, 2018 Declaration of Keith E. Kopplin filed herewith.

said no.  (Tom Dep. Tr. 76: 4-24, 77:10-24, 101:19-102.11.)  This, despite acknowledging that his lawsuit is all about "errors in pay."  (Tom Dep. Tr. 76:10-21.)

Conditional certification may be a lenient standard, but it is not non-existent.  Courts have a duty to avoid stirring up litigation and to "guard against wasting the parties' time and resources where certification is not appropriate at the outset."  *Adair v. Wisconsin Bell, Inc.*, 2008 WL 4224360, at *4 (E.D. Wis. Sept. 11, 2008).[2]  The conclusory allegations in Plaintiff's Motion, which are predicated on individual policy violations, are far too disparate to be addressed as a collective action, even at the conditional certification stage.  Defendant respectfully requests that Plaintiff's Motion be denied as a result.

To the extent the Court determines Plaintiff has met his burden at this stage, Defendant asserts that the scope of the certification should be reduced to a level commensurate with the evidence submitted by the named Plaintiff; specifically, a group of individuals working at Defendant's Oshkosh Facility in the following classifications:  Material Handler I, Assembler I, Assembler II, Paint II, Painter, and Team Lead.  Defendant further asserts that the proposed contents and terms of Plaintiff's notice are defective and should be corrected before any group of individuals that may be conditionally certified by the Court is informed of this lawsuit.

## STATEMENT OF FACTS

**I.      Overview of Generac**

Founded in 1959, Generac Power Systems, Inc. is an innovative, industry-leading global company that designs, manufactures and distributes highly reliable, affordable power products, services and solutions.  (June 8, 2018 Declaration of Kkeiaren Letourneau at Exhibit A, p. PL 0113-0115) (hereinafter "Letourneau Decl.")); Generac Power Systems, Inc., About Us,

---

[2] Unpublished opinions referred to throughout Defendant's Brief are marked and attached to the June 11, 2018 Declaration of Keith E. Kopplin filed herewith.

3

*available at*: http://www.generac.com/about-us/ (last visited June 5, 2018). Generac manufactures products including residential standby generators, pressure washers, portable generators, and commercial and industrial generators. *Id.* For over 50 years, Generac has been protecting the things that power the lives of its customers by providing quality, affordable power solutions. *Id.*

Headquartered in Waukesha, Wisconsin, Generac is a global corporation with locations in the following Wisconsin municipalities: Waukesha, Eagle, Whitewater, Jefferson, and Oshkosh. *Id.* Plaintiff's Motion seeks to certify all hourly manufacturing employees at Generac's Wisconsin locations. (Plaintiff's Proposed Order, Dkt. 24.) Plaintiff's definition expressly encompasses 38 different job titles, in five municipalities, who are currently supervised by more than 24 different individuals, work three different shifts, can be assigned hundreds of different schedules in Defendant's timekeeping software, and a whole variety of different typical practices at the start of the work day. (*See* Declarations of Letourneau, Hayden, Thayer, Lemberger, and Scheffner.)

## II. Generac's Timekeeping and Compensation Policies

Generac's hourly manufacturing employees are subject to an employee handbook, which they receive and acknowledge during orientation. (Letourneau Decl. ¶ 10; Ex. A; Tom Dep. Tr. 71:15-25, 72:1-16.) The handbook requires recording of all hours worked. (Tom Dep. Tr. 73:21-23; 77:10-19; Letourneau Decl. Ex. A, P. 0119.) The handbook also prohibits working any hours without recording the time for payroll. (Letourneau Decl. at Exhibit A, p. PL 0119, PL 0131; Tom Dep. Tr. 77:10-19.) The policy prohibits working overtime without authorization from a manager. (Letourneau Decl. at Exhibit A, p. PL 0119; Tom Dep. Tr. 75:2-17.) Any such hours worked will be paid, but may result in disciplinary action. (Letourneau Decl. ¶ 10; Tom

4

Dep. Tr. 75:2-17.)  The handbook requires immediate reporting of payroll errors to the employee's manager and the payroll department.  (Tom. Dep. Tr. 75:24-25, 76:1-3; Letourneau Decl. at Ex. A, p. PL 0120.)

## III.  Generac's Facilities

Generac has numerous time clocks in its facilities.  (June 8, 2018 Declaration of Brian Larson ¶ 14 (hereinafter "Larson Decl."); Tom Dep. Tr. 85:25, 86:1-2.)  These clocks are used to track employee attendance and labor activities throughout the workday.  (Larson Decl. ¶ 16; Letourneau Decl. ¶ 16; Thayer Dec. ¶ 14; Bartelt Decl. ¶ 3; Leick Decl. ¶ 8; Hayden Decl. ¶ 14.)

Generac's facilities have schedules for each hourly manufacturing employee.  (June 8, 2018 Declaration of Daniel Juedes ¶ 7, 14, 15 (hereinafter "Juedes Decl."); Letourneau Decl. 13; Larson Decl. ¶ 11; Hayden Decl. ¶ 10; Thayer Decl. ¶11.)  These schedules are set in advance, based on production needs.  (Juedes Decl. ¶ 7; Thayer Decl. ¶ 11; Hayden Decl. ¶¶ 10-12; Letourneau Decl. ¶¶13-15.)  Multiple workers have the same work shift.  (Juedes Decl. ¶ 14.) The shifts include start and end times, paid rest breaks, and unpaid meal periods.  (Juedes Decl. ¶ 14; Letourneau Decl. ¶ 27, 28; Tom Dep. Tr. 52:2-18.)  The start and end of shifts and breaks are signaled by a buzzer system at Generac's Facilities.  (Juedes Decl. ¶ 16-17; Tom Decl. Tr. 45:25, 46:1-2, 60:14-22; Hayden Decl. ¶ 28.)  For convenience, including socializing, eating, accommodating unpredictable commutes and weather, allowing time to get settled in, etc., employees are allowed to punch in before the scheduled start of their shifts, but they are prohibited from commencing work until the scheduled start of their shift.  (Letourneau Decl. ¶ 19; Thayer Decl. ¶ 17; Hayden Decl. ¶ 20; Juedes Decl. ¶¶ 11, 13, 19; Leick Decl. ¶ 19; Bartelt Decl. ¶¶ 4-6.)

5

Upon punching in, the computer terminal shows a picture of a clock with the current time and states the time that the employee is expected to begin work based on the scheduled shift start time and that will be reflected on the employee's time sheet for compensation purposes. (Tom Dep. Tr. 97:4-17; Juedes Decl. ¶ 12; Letourneau Decl. ¶ 21; Hayden Decl. ¶ 19; Thayer Decl. ¶19.) Employees regularly tend to personal tasks after punching in to work, such as putting coats or bags in their lockers, bringing their lunch into the break room, reading the newspaper, chatting with friends, or standing around. (Thayer Decl. ¶ 20; Hayden Decl. ¶ 20; Juedes Decl. ¶ 11, 13; Leick Decl. ¶ 19; Bartelt Decl. ¶ 5; Larson Decl. ¶ 21; Letourneau Decl. ¶ 22; Mehrens Decl. ¶ 5; and Long Decl. ¶ 3.) Generac's expectation and understanding is that, even if employees clock-in as they enter the facility, they do not start performing work until the scheduled start of their shifts, which is both displayed on the time clock when every employee clocks in and indicated by the sound of an alarm/buzzer in the facility. (Juedes Decl. ¶ 11, 16; Letourneau Decl. ¶ 21.)

The named Plaintiff, Timothy Tom, Jr. worked at Generac's facility in Oshkosh, Wisconsin (the "Oshkosh Facility"). (Juedes Decl. ¶ 35.) The Oshkosh facility has a total of approximately 160 employees and 7 supervisors. (Letourneau Decl. ¶ 5, 37.) There are two regularly scheduled shifts at the Oshkosh Facility, first shift (from 7:00-3:30) and second shift (from 3:30 to midnight). (Juedes Decl. ¶ 14-15; May 30, 2018 Declaration of Brian Mehrens at ¶ 2 (hereinafter "Mehrens Decl."; May 31, 2018 Declaration of Adam Long ¶ 2 (hereinafter "Long Decl."); Letourneau Decl. ¶ 7.) Mr. Tom used the timeclock near the door. (Tom Dep. Tr. 89:14-20.) It generally takes two to three minutes for Mr. Tom to walk from the computer terminal near the door, where they punch in, to their work stations. (Tom Dep. Tr. 96:1-3.)

Daniel Juedes, Materials Supervisor, supervised Timothy Tom, Jr. (Juedes Decl. ¶ 35.) Typically, Mr. Juedes works a portion of both the first and second shifts. (Juedes Decl. ¶¶ 5-6.)

Mr. Juedes is not aware of any employee who works before the start of their shift, after the end of their shift, or during their unpaid meal period without requesting and receiving both prior authorization and an adjustment to their scheduled times for pay purposes. (Juedes Decl. ¶¶ 20-24, 34, 42-43). Mr. Juedes has had employee complaints about issues, including complaints from Timothy Tom, Jr., but never any complaints about working hours without being paid. (Juedes Decl. ¶ 43.)

Nick Leick, Supervisor in the Fabrication Department at the Oshkosh Facility, supervised opt-in Plaintiff Charles Werba. (June 8, 2018 Declaration of Leick Decl. ¶ 34 (hereinafter "Leick Decl.").) Mr. Leick is not aware of any employee who works before the start of their shift, after the end of their shift, or during their unpaid meal period without requesting and receiving both prior authorization and an adjustment to their scheduled times for pay purposes. (Leick Decl. ¶¶ 20-21.) Mr. Leick has had employee complaints about issues, including complaints from Charles Werba. (Leick Decl. ¶¶ 35, 39.) Mr. Werba complained that he worked past his scheduled shift by a few minutes and it was not recorded, and Mr. Leick explained that the he should work in quarter-hour increments and that Mr. Werba should let Mr. Leick know if he was going to work beyond his scheduled shift because Mr. Leick would approve it to make sure Mr. Werba would be paid for the extra work time. (Leick Decl. ¶ 35.)

Employees are often required to work overtime at the Oshkosh Facility, but they are not allowed to do so without supervisor authorization. (Letourneau Decl. ¶ 10; Juedes Decl. ¶ 3; Larson Decl. ¶ 8; Mehrens Decl. ¶ 6; Long Decl. ¶¶10-12; Tom Dep. Tr. 73:16-23.) Mr. Juedes regularly approves overtime requests of employees to work more hours than their scheduled shifts and many employees he supervises receive significant overtime pay. (Juedes Decl. ¶¶ 31-32.) Timothy Tom, Jr. was never told no when he asked Mr. Juedes permission to work extra

7

hours.  (Tom Dep. Tr. 82:4-11; 103:9-11)  Any time Tim Tom, Jr. asked his supervisor to work

extra hours, his supervisor granted the request.  (Tom Dep. Tr. 82:4-11.)  In 2017, employees at

the Oshkosh Facility were paid a total of $388,547 in overtime, representing 13,699 hours in

overtime.  (Letourneau Decl. ¶ 31.)

Hourly manufacturing employees at the Oshkosh Facility know:

- They are not to work outside of their scheduled shifts  without permission;

- They are to be  paid for all hours worked;

- If they work hour without permission they are still paid for those hours, though they
  may face discipline;

- Bells or buzzers generally signal the beginning and end of work activities and paid
  time;

- Generac has an expectation and process for employees to report timekeeping issues
  and correct errors in their pay.

(Long Decl. ¶ 6, 7, 10-13; Mehrens Decl. ¶¶ 6-8; Bartelt Decl. ¶ 4-8.)

Hourly manufacturing employees at the Oshkosh Facility have not been told to work

hours without pay, or discouraged from working hours without pay.  (Long Decl. ¶ 14, 15;

Mehrens Decl. ¶ 11; Bartelt Decl. ¶ 12.)

Hourly manufacturing employees at the Oshkosh Facility believe they have been properly

paid for the hours they actually worked and do not wish to join this lawsuit.  (Long Decl. ¶ 22;

Mehrens Decl. ¶ 12; Bartelt Decl. ¶ 13.)

At Defendant's Waukesha facility, there are 63 different scheduled shifts, within first

shift (7:00 a.m. to 3:30 p.m.) and second shift, which was running prior to May 2018 (3:30 p.m.

to midnight).  (June 11, 2018 Declaration of Marni Lemberger ¶¶ 10, 28 (hereinafter "Lemberger

Decl.").)  The Waukesha facility currently has a total of 9 hourly manufacturing employees. (Lemberger Decl. ¶ 4.)  Employees are often required to work overtime at the Waukesha facility, but they are not allowed to do so without supervisor authorization.  (Lemberger Decl. ¶ 7.)  In 2017, employees at the Waukesha Facility were paid a total of $707,883.00 in overtime, representing 24,723 hours, in overtime.  (Lemberger Decl. ¶ 28.)

Defendant's Whitewater Facility currently has 650 hourly manufacturing employees, 11 supervisors, three shifts (with multiple start/end times for each shift), and 112 schedules. (June 8, 2018 Declaration of Erin Thayer ¶¶ 4-7, 11, 34 (hereinafter "Thayer Decl.").).  In 2017, Generac paid employees at the Whitewater Facility a total of $3,436,252.00 in overtime, representing 137,888 hours in overtime.  (Thayer Decl.  ¶ 29.)

Defendant's Eagle Facility currently has 290 full-time hourly manufacturing employees, two shifts, and 58 schedules.  (June 7, 2018 Declaration of Brianna Scheffner ¶¶ 8, 9, 10 and 14 (hereinafter "Scheffner Decl.").)  In 2017, Generac paid employees at the Eagle Facility a total of $1,390,829.69, representing a total of 47,130.03 hours, in overtime.  (Scheffner Decl. ¶ 35.)

Defendant's Jefferson Facility currently has approximately 250 hourly manufacturing employees, six supervisors, three shifts, and 20 different schedules.  (June 8, 2018 Declaration of Nick Hayden ¶¶ 4, 10, 34, 35 (hereinafter "Hayden Decl.".))  In 2017, Generac paid employees at the Jefferson Facility a total of $1,068,893.95, representing 44,767, in overtime.  (Hayden Decl. ¶ 29.)

## **LEGAL ARGUMENT**

## I.    **Conditional Certification Is Not Automatic Under 29 U.S.C. § 216(b)**

The FLSA permits collective actions "against any employer . . . by any one or more employees for and on behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b).  Courts in the Seventh Circuit generally use a two-step analysis for certifying

9

a collective action under the FLSA. *See, e.g., Jimenez v. GLK Foods LLC*, 2013 WL 3936928, at *2 (E.D. Wis. July 30, 2013) (citing *Adair v. Wisconsin Bell, Inc.*, 2008 WL 4224360, at *11 (E.D. Wis. Sept. 11, 2008)).

Plaintiff seeks conditional certification, which is the first step, and must therefore make "a modest factual showing sufficient to demonstrate that [he] and potential plaintiffs together were victims of a common policy or plan that violated the law." *Adair,* 2008 WL 4224360, at *3 (citation omitted); *Brabazon v. Aurora Health Care, Inc.*, 2011 WL 1131097, at *3 (E.D. Wis. Mar. 28, 2011). If a group of individuals is conditionally certified, notice may be sent to potential members to facilitate an opt-in procedure. *Jimenez*, 2013 WL 3936928, at *2.

The "modest factual showing standard is not a mere formality. *Adair,* 2008 WL 4224360, at *3 (internal quotations omitted); *Krupp v. Impact Acquisitions LLC*, 2016 WL 7190562) at *5 (E.D. Wis. Dec. 12, 2016). "This is because a plaintiff's discovery demands upon conditional certification may impose a tremendous financial burden to the employer and courts must be careful to guard against wasting the parties' time and resources where certification is not appropriate at the outset." *Krupp*, 2016 WL 7190562, at *5 (internal quotations omitted); s*ee also Adair,* 2008 WL 4224360, at *4.

To meet this burden, plaintiffs are required to produce *admissible* evidence to support their requests for conditional certification. *Adair,* 2008 WL 4224360, at *8. If, as is the case here, a plaintiff bases his request for conditional certification on an alleged company-wide policy, he must offer *admissible* evidence that he and the proposed class were subject to a common unlawful practice. *Adair,* 2008 WL 4224360, at *8.

Additionally, courts do not limit themselves to considering only the proof offered by the Plaintiff. "Rather, the court evaluates the record before it, including the [defendant's]

oppositional affidavits, to determine whether the plaintiffs are similarly situated to other putative class members." *Krupp*, 2016 WL 7190562, at *5. The "critical inquiry in determining whether a court should exercise its discretion to authorize the sending of notice to potential plaintiffs is whether the representative plaintiff has shown that []he is similarly situated to potential class plaintiffs." *Adair*, 2008 WL 4224360, at *2 (citing omitted). Here, the very nature of Plaintiff's allegations confirms that there is no common unlawful practice or policy.

## II. Plaintiff Cannot Establish That He And The Individuals He Purports To Represent Were Together Victims of A Common Policy, Plan, or Decision By Generac to Violate the FLSA.

"A plaintiff who seeks conditional certification of a collective action against an employer must do more than show that some employees were paid less than the FLSA required." *Thompson v. Speedway SuperAmerica LLC*, 2009 WL 130069, at *1 (D. Minn. Jan. 20, 2009); *Rappaport v. Embarq Mgmt. Co.*, 2007 WL 4482581, at *4 (M.D. Fla. Dec. 18, 2007) (noting the burden "is not invisible."). Plaintiff must show he is similarly situated to potential class members. *Adair*, 2008 WL 4224360, at *3 (E.D. Wis. Sept. 11, 2008). That is, Plaintiff must put forth admissible evidence establishing factual support for his allegations that together he and the putative class members were victims of a common policy or plan that violated the law." *Id.* at *3, 8. "A plaintiff may not demonstrate []he is similarly situated for the purposes of conditional class certification by relying on "unsupported assertions of additional plaintiffs and widespread FLSA violations." *Pecor v. North Point EDC Inc.*, 2017 WL 3723600, at *4 (E.D. Wis. June 9, 2017) (citing *Littlefield v. Dealer Warranty Servs., L.L.C.*, 679 F. Supp. 2d 1014, 1017 (E.D. Mo. 2010)).

Here, the only commonality is Generac's lawful policy of paying employees for all hours worked – to the tune of more than $8,000,000, in 2017 alone, to the employees implicated by Plaintiff's Motion. The written policies prohibit working hours without pay and provide

reporting channels for any errors. The policies are further reinforced by a system of buzzers at each of Generac's Facilities, signaling the beginning and end of the compensable work day, and graphic depictions of when paid time begins and ends on Generac's timeclocks.

Faced with Generac's lawful written policies, practices, and procedures, Plaintiff resorts to mischaracterizing Generac's time clock rules from utilizing lawful grace periods, to perpetuating unlawful one-way rounding practices. In this way, Plaintiff seeks to manufacture a single policy, plan, or decision to bind him and the other individuals he purports to represent. Because of the inherently individualized nature of Plaintiff's theory, however, conditional certification is inappropriate.

### A. Generac's Policies Prohibit Off-the-Clock Work.

"Where there is evidence that employers have, and enforce, appropriate pay policies, that evidence weighs strongly against conditional certification." *Nieddu v. Lifetime Fitness, Inc.,* 977 F. Supp. 2d 686, 703 (S.D. Tex. 2013) (denying conditional certification and finding plaintiff "failed to meet his burden to show that he and putative class members are similarly situated or 'the victims of a single decision, policy, or plan' to warrant conditional certification of his proposed class") (citing, *inter alia, Saleen v. Waste Mgmt., Inc.,* 649 F. Supp. 2d 937, 940–41 (D. Minn. 2009)).

Generac's hourly manufacturing employees are entitled to overtime for all hours they may work in excess of forty (40) in a workweek. (Letourneau Decl. at Exhibit A, p. PL 0119; Juedes Decl. ¶ 3.) Although overtime may be required, all such hours must be authorized by a manager in advance. (Letourneau Decl. at Exhibit A, p. PL 0119; Juedes Decl. at ¶ 3; Tom Dep. Tr. 73:16-20.) If an hourly manufacturing employee works overtime without receiving prior

authorization from a manager, the time will be paid, but they may be subject to disciplinary action.  (Letourneau Decl. at Exhibit A, p. PL 0119; Juedes Decl. ¶ 3; Tom Dep. Tr. 75:2-7.)

Hourly Manufacturing employees are prohibited from working any time, including overtime, without recording that time and being fully paid for it; if they do so, they will be disciplined, up to and including termination.  (Tom Dep. Tr. 75:25-76:6; Letourneau Decl. ¶ 10.) As Generac's policies inform hourly manufacturing employees:

> You are responsible for making sure that the correct times are collected for the purpose of paying you accurately. If you have any problems, including a restriction or missed entry, please notify your manager immediately. If you leave the premises for any reason, your card must show the time you leave and the time you return. When starting bells ring, you are to be at your station ready to work.

(Letourneau Decl. at Exhibit A, p. PL 0131.)  Generac's policies further confirm that falsifying company records including labor or time reporting may be grounds for immediate discharge. (Letourneau Decl. at Exhibit A, p. PL 0132; Tom Dep. Tr. 73:21-23.)  Hourly manufacturing employees are also expected and required to report any errors in their pay to their manager and the Human Resources Department so that those errors can be investigated and necessary corrections made.  (Tom Dep. Tr. 76: 4-9, 77: 10-19; Juedes Decl. ¶ 3; Mehrens Decl. ¶ 8; Letourneau Decl. at Exhibit A, p. PL 0120.)

### B.     Generac Utilizes Grace Periods, Which Are Permitted By The FLSA.

Perhaps recognizing the lawful nature of Generac's written policies, Plaintiff and the other two declarants supporting his Motion have resorted to a mischaracterization of Generac's time clock policies as an unlawful "rounding" practice in which time is always adjusted to the employees' detriment.  However, "[s]omething more than bald affidavits must be presented when the claims are contradicted by documentary evidence."  *Martinez v. Regency Janitorial Services, Inc.*, 2012 WL 252230, at * 4 (E.D. Wis. Jan. 26, 2012).

13

The evidence here shows not only that Generac's policies are lawful, but also that Generac does not even have the type of "rounding" practice suggested by Plaintiff. To the contrary, Generac provides employees with grace periods before and after their scheduled shifts. Pursuant to the grace periods provided, employees may "clock in" before their scheduled shift starts and "clock out" after their scheduled shift ends; however, Generac has a policy that employees are prohibited from working before or after their scheduled shift, unless they have the approval of a manager. (Mehrens Decl. ¶ 8; Long Decl. ¶ 13; Bartelt Decl. ¶ 8; Tom Dep. Tr. 45:23-46:17, 73:10-13, 96:12-97:17; Tom. Dep. Tr. 75:2-17.) The grace periods are provided to employees so they have an opportunity to take care of any personal matters before and after scheduled shift work, including, among other things, eat a meal, socialize with co-workers, hang out in the break room, smoke, check email, play video games, check Facebook, use a personal electronic device, and read the newspaper. (Mehrens Decl. ¶ 5; Long Decl. ¶ 3; Bartelt Decl. ¶ 5; Leick Decl. ¶ 19; Larson Decl. ¶ 17; Juedes Decl. ¶ 13; Tom Dep. Tr. 45:23-46:17, 73:10-13, 96:12-97:17; Tom. Dep. Tr. 75:2-17; Tom Dep. Tr. 92:7-17)

The FLSA regulations expressly contemplate and authorize grace periods like those employed at Generac's Oshkosh Facility. The regulations state:

> Time clocks are not required. In those cases where time clocks are used, employees who voluntarily come in before their regular starting time or remain after their closing time, do not have to be paid for such periods provided, of course, that they do not engage in any work. Their early or late clock punching may be disregarded. Minor differences between the clock records and actual hours worked cannot ordinarily be avoided, but major discrepancies should be discouraged since they raise a doubt as to the accuracy of the records of the hours actually worked.

29 C.F.R. § 785.48(a). This regulation confirms that there may be differences between time clock records and actual hours worked and that such discrepancies do not constitute *per se* violations of the FLSA. Under 29 C.F.R. § 785.48(a) employers may properly disregard pre- and

14

post-shift time punches when employees come in voluntarily before their regular start time, or remain voluntarily after their end time, and do not perform work. *Weil v. Metal Technologies, Inc.*, 260 F. Supp. 3d 1002, 1013 (S.D. Ind. 2017) (holding time clock records alone do not establish the hours actually worked by employees).

To confirm that no unpaid work is performed, Generac not only maintains policies and issues directives prohibiting such work without management approval, and proper compensation, Generac also provides visual reminders to hourly manufacturing employees of the start and end of their work shifts when they clock in and out, and audible reminders in the form of an alarm/buzzer system that rings throughout each of Generac's facilities, signaling the exact times at which compensable work should begin and end, including for unpaid breaks. (Mehrens Decl. ¶ 8; Long Decl. ¶ 13; Bartelt Decl. ¶ 8; Tom Dep. Tr. 45:23-46:17, 73:10-13, 96:12-97:17.)

**C. Plaintiff's Theory Relies On Highly Independent and Individualized Variables, Which Make It Inappropriate For Conditional Certification.**

At its core, then, Plaintiff's theory assumes Generac's hourly manufacturing employees knowingly violated Defendant's lawful policies, ignored the bells marking the beginning and end of their scheduled work day, and disregarded the visual depictions of their compensable workday on Defendant's time clock system, all with their supervisor's knowledge but without raising any questions or concerns to Defendant's human resources or payroll professionals. Such theories are entirely inappropriate for treatment as collective actions – even at the conditional certification stage – because they depend upon each individual's personal choices, not a common policy, plan, or decision of their employer.

i. Plaintiff's Theory Assumes Policy Violations.

Timothy Tom, Jr. purports to be similarly situated to Generac's current and former hourly manufacturing employees for purposes of bringing these off-the-clock claims against Generac on

their behalf. During his deposition, however, Mr. Tom, Jr. acknowledged that Generac's policy is that employees are not to work overtime without authorization from their supervisors, that employees are supposed to record all time worked, and that employees are supposed to report any payroll errors so they can be fixed. (Tom Dep. Tr. 73:16-23; 75:2-25, 76:1-3.) Mr. Tom, Jr. also acknowledged that the time that will be recorded as the employee's start time, and thus the employee will start being paid, is listed on the time clock computer screen every day when employees punch in and also, in most cases, is indicated by a bell or buzzer. (Tom Dep. Tr. 60:18-22.) He admitted that working hours without pay was a violation of Generac's policies. (Tom Dep. Tr. 77:10-24.)

When pressed further, Mr. Tom, Jr., confirmed that no one at Generac ever told him to work time for which he would not be compensated. (Tom Dep. Tr. 105:23-106:19.) No one told him he needed to start working before the time indicated on the time clock when he punched in. (Tom Dep. Tr. 106:3-7.) And his supervisor always granted his requests to work more hours. (Tom Dep. Tr. 82:4-11.) To that end, he regularly incurred overtime, working 50 to 60 hours per week. (Tom Dep. Tr. 84:20-85:3.)

In light of his testimony, it is Plaintiff's alleged conduct (working immediately after punching in, during an unpaid meal break, or after the buzzer sounds signaling the end of the shift) that is improper, not Generac's policy. If Plaintiff had followed Generac's policies and asked to work outside of his scheduled shifts, and thus incur overtime, his supervisor could have and would have either denied the request or approved the request and adjusted Plaintiff's schedule to be sure Plaintiff was paid for all the time he worked as his supervisor did many times. (Tom Dep. Tr. 84:4-6; Juedes Decl. ¶ 40.) In fact, Plaintiff testified that he had been granted all such requests he made to his supervisor. (Tom Dep. Tr. 82:4-11.)

16

Similarly, if Plaintiff had reported that his paycheck did not compensate him for all the hours he allegedly worked, Generac could have and would have corrected the pay and reminded him not to start work before the start of his shift, or continue work after the end of his shift, without his supervisor's approval. In fact, Mr. Tom had raised issues and concerns at multiple times during his employment with Generac (Tom Dep. Tr. 103:11-135:5; Juedes Decl. ¶ 41; Letourneau Decl. ¶ 44), including issues when his punches were not correct (Tom Dep. Tr. 135:21-136:13), he just never raised any issues or allegations that he was working hours without pay as he is now claiming in this lawsuit (Tom Dep. Tr. 101:1-102:11).

Again, Plaintiff's Motion depends upon the court assuming that he and all other hourly manufacturing employees are regularly violating Generac's policies prohibiting working overtime without approval (Tom Dep. Tr. at 73:16-20; Letourneau Decl. at Exhibit A, p. PL 0119; Juedes Decl. ¶ 3), are inaccurately recording time worked (Tom Dep. Tr. At 73:21-23; Letourneau Decl. at Exhibit A, p. PL 0131; Juedes Decl. ¶ 3), and are failing to report payroll errors (Tom Dep. Tr. at 75:24-25, 76:1-3; Letourneau Decl. at Exhibit A, p. PL 0120; Juedes Decl. ¶ 3). Plaintiff's theory further assumes that he and all hourly manufacturing employees are similarly disregarding the notation that appears every day when they clock in telling them what time will be recorded on their timesheet, and are similarly disregarding the alarms/buzzers that signal the start and end of the paid shifts and unpaid breaks. Importantly, because he admits no one told him to work hours without pay, Plaintiff's theory also requires individual inquiries into not only the reason(s) he violated company policy and directive, and ignored visual and audible reminders, by working hours without pay, but also why he failed to report time and/or pay discrepancies.

Individualized decisions to work outside of the scheduled hours, without supervisor authority and in clear violation of the governing employment policies, are insufficient to establish that Plaintiff and the individuals he seeks to represent were together the "victims" of a common policy, plan, or decision. *See Nieddu v. Lifetime Fitness, Inc.,* 977 F. Supp. 2d 686, 705 (S.D. Tex. 2013) (denying conditional certification and finding plaintiff "failed to meet his burden to show that he and putative class members are similarly situated or 'the victims of a single decision, policy, or plan' to warrant conditional certification of his proposed class); *Steger v. Life Time Fitness, Inc,*, 2016 WL 245899, at *3 (N.D. Ill. Jan. 21, 2016) (denying conditional certification on the basis that, "a highly individualized analysis would nonetheless be necessary to determine the extent to which each employee worked off the clock and whether that conduct was attributable to Life Time" where the evidence shows the proposed class was impacted, not by a uniform unwritten corporate policy to work off the clock without pay, but rather by the individual choices and decisions of employees) (*reconsideration denied* 2016 WL 6647922 (N.D. Ill. Nov. 10, 2016)).

Even where two or three putative plaintiffs might share some factors in common,[3] conditional certification is not appropriate where "a highly individualized analysis would nonetheless be necessary to determine the extent to which each employee worked off the clock and whether that conduct was attributable to" the employer. *Steger*, 2016 WL 245899, at *3.

_____

[3] Although Ms. Lewandowski alleges she worked outside of her scheduled shift, she never alleges that anyone at Generac told her she needed to clock-in early and commence work before her scheduled start time or continue to work beyond her scheduled end time and then clock-out late. (Dkt. 28, p. 1-2.) As important, she never complained to Human Resources about working hours without pay, despite raising issues about attendance infractions, workers compensation, and leaves of absence. (Lemberger Decl. ¶¶ 38,39.)

Opt-in Plaintiff Werba, for his part, alleges that he addressed his concerns in January 2016, with then-HR Manager Joel Luepke. (Dkt. 30, ¶¶ 14-15.) Mr. Werba doesn't allege he was told to work without pay, however. To the contrary, Mr. Werba admits and acknowledges that Mr. Luepke provided Mr. Werba with an option on how to make sure he was in fact paid for all time worked. (Dkt. 30, ¶ 14.)

18

Therefore, like *Nieddu* and *Steger*, the highly individualized inquiries which will be required here "would substantially eliminate the judicial efficiency, and the resulting benefit to the parties, traditionally attained through the collective treatment of claims." *Steger*, 2016 WL 245899, at *4; *Nieddu*, 977 F. Supp. 2d at 705. Conditional certification should be denied as a result.

ii.    <u>Plaintiff's Theory Assumes Generac's Knowledge.</u>

Not only does Plaintiff's theory assume each of the individuals he purports to represent were violating policies and directives, ignoring the buzzers, and disregarding cues on the time clocks. It also assumes they did so with their supervisor's actual or constructive knowledge. *See Kellar v. Summit Seating Inc.*, 664 F. 3d 169 (7th Cir. 2011).

Again, the named Plaintiff, and self-declared representative, provides an appropriate starting point. During his deposition, Mr. Tom, Jr. admitted that no one told him to work hours without pay. He also admitted that he didn't know if his own supervisor knew he was working without pay:

> Q:    Now, earlier you testified that you would start working at 3:00 to 3:10. Why did you start working 24 minutes earlier that day?
>
> A:    Because I punched in earlier.
>
> Q:    Did anybody tell you to start working that early?
>
> A:    No.
>
> Q:    Did Dan know you were working that early?
>
> A:    Yes.
>
> Q:    How did Dan know?
>
> A:    I'd see him in passing. He'd be, like, oh, you're here early.
>
> Q:    So you were here early, but how did he know you were working?

19

A:    He'd see me back at the warehouse desk, I guess. I don't know.  I can't
      speak –

Q:    So you don't know?  You don't know if he knew you were working?

A:    I can't speak to his observation.  No.

(Tom Dep. Tr. 105:23-106:19.)

Well, if Mr. Tom's own supervisor didn't know he was working without pay, who did? Not only did Generac paid more than $8M in overtime to the individuals Plaintiff purports to represent in 2017, alone, it also had – and continues to have – rules in place to ensure that work is not performed without permission and pay.  *See* Legal Argument, Section II.A, *supra*. Employees were also provided daily reminders of the start and stop times for compensable work *via* an express statement on the time clock and a bell/buzzer system in its facilities.  (Tom. Tr. 60:18-22; Mehrens Decl. ¶ 4; Juedes Decl. ¶12; Long Decl. ¶¶ 6-7, 12.)

In addition to the foregoing rules and reminders designed to avoid unauthorized work, Generac's supervisors held weekly meetings/huddles (usually on Wednesday at the Oshkosh facility) part of the purpose of which was to discuss any overtime that would be authorized, if not required, that upcoming Saturday or the following week.  (Long Decl. ¶ 10; Juedes Decl. ¶ 27; Tom Dep. Tr. 90:17-91:1.)  Neither Plaintiff, nor the other two declarants, reported during those weekly meetings that they worked outside of their scheduled shifts, nor did they complain about not being compensated for any such work.[4] (Juedes Decl. ¶¶ 39-41.)

Plus, other hourly manufacturing employees at Generac's Oshkosh Facilities clearly knew and understand Generac's policies, procedures, and expectations regarding their employment.  They are not to work outside of their scheduled shifts without permission; they are

---

[4] While Charles Werba alleges he disclosed time reporting concerns to his supervisor and human resources, he does not allege his complaints were made during weekly huddle meetings and he also admits that the individuals explained to him how he should be clocking in and out to ensure he was paid for all time he worked.  (Werba Decl. ¶ 14-15.)  Again, no one required him to work off the clock. (Leick Decl. ¶ 35.)

to be paid for all hours worked; if they work hour without permission they are still paid for those hours, though they may face discipline; bells or buzzers generally signal the beginning and end of work activities and paid time; and Generac has a process to allow employees to correct errors in their pay. (Long Decl. ¶ 6, 7, 10-13; Mehrens Decl. ¶¶ 6-8; Bartelt Decl. ¶ 4-8.)

"Given these circumstances, [Generac] had little reason to know, or even suspect, [Plaintiff and the proposed opt-ins were] acting in direct contradiction of a company policy and practice . . . Accordingly, no reasonable trier of fact could conclude that [Generac] had reason to know that [Plaintiff and the proposed opt-ins were] working [outside their scheduled] shift." *Kellar*, 664 F.3d at 177-78.

Notwithstanding the foregoing, Plaintiff would have the court equate time clock punches with compensable work activities. According to Plaintiff, Generac knew its hourly manufacturing employees were working because they had punched in. (Pl.'s Br. at 11.) Of course, that won't due either. *See Kellar*, 664 F.3d at 177 ("Kellar points to her time cards, which reflect that she clocked in early, and argues she was performing pre-shift work. But Kellars's clocking in early would not necessarily have alerted Summit that Kellar was performing pre-shift work.") (citing 29 C.F.R. §785.48.) As outlined above, Generac utilizes a lawful grace period with visual and audible reminders of when compensable work activities, and pay, should commence.

The grace period permits employees to safely get to the facility, and then undertake any number of personal activities, such as depositing personal items like coats, bags, or lunches, smoking cigarettes, drinking coffee, reading the newspaper, or socializing, after they clock in. (Juedes Decl. ¶ 11, 13; Long Decl. ¶ 3; Mehrens Decl. ¶ 5.) Indeed, Generac is arguably

required by the National Labor Relations Act to permit employees access to their worksites before their scheduled work shifts. *See, e.g., Tri-County Med. Ctr.*, 222 NLRB 1089 (1976).

Like the employee in *Keller*, the evidence here shows that Generac's hourly manufacturing employees do not work if they clock-in early before their shift, but rather, engage in personal activities. As the Seventh Circuit confirmed, being physically at work does not mean one is actually working, let alone with the knowledge of his or her employer. *See Kellar*, 664 F. 3d 169 at 177-178; *see also Weil v. Metal Technologies, Inc.*, 260 F. Supp. 3d 1002, 1013 (S.D. Ind. 2017) (holding time clock records alone do not establish the hours actually worked by employees).

Indeed, the evidence submitted by some of the very individuals Mr. Tom, Jr. seeks to represent, working at the same facility he did, confirms the opposite. According to Adam Long:

> I never start working before the start of my scheduled shift time because hourly manufacturing employees are only allowed to begin working at your scheduled start time unless you are authorized by a manager to work before your scheduled shift. I also know that when the buzzer goes off at 7:00 a.m. work should start, and when the buzzer goes off at 3:30 p.m. I should stop work.

(Long Decl. ¶¶ 5-6.) Similarly, Brian Mehrens confirmed as follows:

> Although I clock in before the start of my shift, I know that I am not required or allowed to begin my work activities until my scheduled start time, which is depicted on the computer terminal when I clock in and further signaled by an alarm buzzer at the Oshkosh Facility alerting hourly employees that they should be at their workstations commencing work activities. I don't start working until my scheduled start time because I know my scheduled start time is when I start getting paid.

(Mehrens Decl. ¶ 4.) Likewise, Donn Bartelt declared:

> Although I clock in before the start of my shift, I know that unless my supervisor says otherwise, I am not required or supposed to begin my work activities until my scheduled start time, which is depicted on the computer terminal when I clock in and, when I start at 7:00 a.m., is further signaled by an alarm buzzer at the Oshkosh Facility alerting hourly employees that they should be at their workstations commencing work activities.

22

(Bartelt Decl. ¶ 4.)

Nothing in the record suggests Cary Lewandowski's, Charles Werba's or Timothy Tom, Jr.'s supervisors know or had reason to know they were performing unauthorized work outside of their scheduled shifts. Mr. Tom's supervisor, Dan Juedes, confirms that:

> At no point during my employment with Generac, have I ever required or allowed an hourly manufacturing employee to work before their scheduled start time, during an unpaid meal period, or after their scheduled end time without making sure they were fully and properly paid for all of the hours they actually worked. I am not aware of any employees working any hours without being paid. In my capacity as a Supervisor at Generac's Oshkosh facility I supervised Timothy Tom . . . Mr. Tom never complained to me about any problems with his timekeeping or compensation for time worked at Generac. On several occasions, Mr. Tom asked to come in early and work overtime, and I granted those requests. I adjusted Mr. Tom's schedule and he was paid for the extra work time. I am not aware of Mr. Tom starting work before his scheduled start time other than those occasions when he requested to do so and I adjusted his schedule accordingly. At no point during my employment with Generac, have I ever required or allowed an hourly manufacturing employee to work before their scheduled start time, during an unpaid meal period, or after their scheduled end time without making sure they were fully and properly paid for all of the hours they actually worked

(Juedes Decl. ¶¶ 34-35, 39-42.)

Standing in contrast to Plaintiff's claim now that he and other hourly manufacturing employees were working hours without pay is the fact that he routinely requested, and received permission, to work extra hours. (Tom Dep. Tr. 82:4-11.) In fact, he did not recall ever being told no to such a request. Further, the Oshkosh facility paid a total of $388,547 in overtime, representing 13,699 hours in overtime in 2017, alone. In the aggregate, the five locations implicated by Plaintiff's Motion paid more than $8 Million in that time frame. (Thayer Decl. ¶ 29; Letourneau Decl. ¶ 31; Hayden Decl. ¶ 29; Scheffner Decl. ¶ 35; and Lemberger Decl. ¶ 28)

The FLSA stops short of requiring the employer to pay for work it did not know about, and had no reason to know about. *See* 29 U.S.C. § 203(g); *see also Kellar*, 664 F.3d at 177.

Plaintiff admits that while his lawsuit is all about alleged errors in pay, he never reported an error in pay to his manager or to payroll at Generac. (Tom Dep. Tr. 76: 4-24, 77:10-24). Plaintiff also admits that while it was a violation of policy to begin working before the scheduled shift starts, he nevertheless engaged in this behavior without any instruction to do so and without his supervisor's knowledge. (Tom Dep. Tr. 105:25-106:19, 107:6-8). Plaintiff's admissions, Defendant's policies and directives, the payment of substantial amounts of overtime, and the absence of internal complaints confirm that Defendant did not know, or have reason to know, of any off-the-clock work being performed.

The decisions made by Plaintiff and the two declarants to violate company policy and work outside of their scheduled shift times, without authorization, requires individualized inquiries such that they cannot prove they are together victims of a common policy, plan, or decision supporting conditional certification. "Where [as here] the plaintiff has not made at least a modest factual showing that certification is appropriate, it would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated." *Adair*, 2008 WL 4224360, at *4 (internal quotations omitted) (citing *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003)).

**D.**     **The Group Plaintiffs Seek To Represent Is Too Broad.**

Even if there were a common unlawful policy, plan, or decision, which there is not, conditional certification should still be denied because the proposed scope of the conditional class is overbroad. The proposed class includes too many different job classifications and dissimilar facilities. Plaintiff's proposed class includes 38 different job titles, in five Wisconsin municipalities, encompassing a total of approximately 1,250 current hourly, manufacturing employees with more than 24 different current supervisors, and hundreds of different possible

24

current shifts.  This, Plaintiff seeks to conditionally certify with just his own statement and the statements from two other hourly manufacturing employees.[5]

"The variety of job duties, geographic locations, and salaries at issue may result in claims that are too individualized and difficult for the court to manage collectively."  *Russell v. Illinois Bell Telephone Co., Inc.*, 721 F. Supp. 2d 804, 811 n. 2 (N.D. Ill. 2010).  Here, the breadth of job titles, supervisors, and locations would certainly impact the frequency, nature, duration, and rationale of any unauthorized pre- or post-shift work, work during lunch breaks, or overtime work that employees may have performed, but for which they claim they were not paid.  As held in *Abraham v. Group O, Inc.*, when there is a wide variety in the circumstances surrounding each Plaintiff's employment, it indicates that the proposed plaintiffs' claims arise from different sets of relevant facts rather than from a single common series of transactions or occurrences. 2018 WL 620034, at *4 (N.D. Ill. Jan. 30, 2018).

Furthermore, nothing in the three declarations submitted in support of Plaintiff's Motion suggests the individuals have any personal knowledge of the working conditions or experiences of Generac's other hourly manufacturing employees in Whitewater, Eagle, or Jefferson.  The "critical inquiry in determining whether a court should exercise its discretion to authorize [notice] is whether the representative plaintiff has shown that she is similarly situated to potential class plaintiffs." *Adair,* 2008 WL 4224360, at *2 (citations omitted).

To the extent the Court grants conditional certification, Defendant respectfully asserts it should be limited in scope to a group commensurate with Plaintiffs' evidence.  *See e.g., Harper v. Lovett's Buffet, Inc.*, 185 F.R.D. 358 (M.D. Ala. 1999) (notice was limited to one of Defendant's many restaurants where the evidence submitted supported possible FLSA violations

---

[5] Although 12 total individuals have filed opt-in consent forms, only three have submitted evidence in support of Plaintiff's Motion.  Further, of the 12 total individuals, all but one worked their tenure with Generac at the Oshkosh Facility.

with regard to only that one restaurant); *Camper v. Home Quality Management, Inc.*, 200 F.R.D. 516 (D. Md. 2000) (issuance of notice was limited to one of Defendant's 47 facilities where the Plaintiffs' sworn affidavits and other evidence alleged the employer's actual or constructive knowledge that its employees are working off the clock with regard to only one facility); *DeMarco v. Northwestern Mem'l Healthcare,* 2011 WL 3510905 (N.D. Ill Aug. 10, 2011) (the court may narrow the lead plaintiff's proposed opt-in class where the first-stage evidence provides no tangible support for including certain employees in the class); *Brand v. Comcast Corp.*, 2012 WL 4482124 (N.D. Ill. Sept. 26, 2012) (notice was limited to only one facility in which plaintiff's worked because they failed to provide adequate evidence of the practices at other locations and that employees were required to perform uncompensated work at those facilities).

Here, the class should be limited to individuals working in the following classifications, exclusively at Defendant's Oshkosh Facility: Material Handler I, Assembler I, Assembler II, Paint II, Painter, and Team Lead.

## III. Assuming, *Arguendo*, Conditional Certification Of Some Group of Generac's Employees is Appropriate, The Contents and Terms of Plaintiff's Proposed Notice of Pendency of Lawsuit Are Deficient.

District courts have discretion in appropriate cases to implement the opt-in provision of the FLSA by facilitating notice to potential plaintiffs. *See Hoffman-Laroche Inc. v. Sperling,* 493 U.S. 165, 169 (1989); *see also Woods v. New York Life Ins. Co.,* 686 F.2d 578, 580 (7th Cir. 1982). "Authorization of notice serves the broad, remedial purpose of the statute and comports with the court's interest in managing its docket." *Sjoblom v. Charter Communications, LLC,* 2007 WL 4560541, *7 (W.D. Wis. Dec.19, 2007) (citing *Hoffman-Laroche,* 493 U.S. at 172-74).

That said, in *Hoffman-La Roche*, the Supreme Court recognized that district courts' discretion regarding notice is not "unbridled," and stated that notice should be "distinguishable in form and function from the solicitation of claims." *Id.* In sum, "courts must be scrupulous to respect judicial neutrality [and] take care to avoid even the appearance of judicial endorsement of the merits of the action." *Id.* at 174.

Plaintiff's proposed Notice of Pendency of Lawsuit is defective in certain respects. If the Court conditionally certifies any collective action in this matter, Defendant requests the following issues be addressed before any notice is distributed:

**A.**      **The Absence of Defendant's Position Regarding Plaintiff's Claims.**

As drafted, Plaintiff's Notice suggests his claims and allegations are uncontested, or have already been decided in his favor. Neither is the case; as such, Defendant requests that the following language be inserted in the "Description of the Action" in the proposed Notice:

> Generac denies all allegations of wrongdoing and violations of the law in the lawsuit. Generac believes that it has complied with the FLSA, and any other applicable laws, and that the Plaintiff is not similarly situated to the individuals he seeks to represent. Generac also denies that it "rounds" periods of time during which employees are working or requires any employees to work without pay, whether before their shift, during unpaid meals, or after their shift.

Defendant asserts that including its position with respect to Plaintiff's claims is consistent with their contested nature. (See Defendant's December 15, 2017 Answer and Statement of Defenses, Dkt. #9.)

Defendant further asserts that the Notice does not adequately inform potential opt-in plaintiffs that they may be called to testify during a deposition or at trial. *See Russell v. Ill. Bell Tel. Co.*, 575 F. Supp. 2d 930 (N.D. Ill. 2008). As such, Defendant requests that the first sentence of the second paragraph in the "Effect of Joining or Not Jointing [sic] This Action"

should be revised to conclude with the phrase " . . . , sit for depositions, and testify in court" instead of the phrase ". . . or otherwise participate in it."

## B.    The Description of the Recipients of the Notice and the Class List.

To avoid confusion regarding the scope of any group of individuals the Court conditionally certifies, Defendant requests that the word "hourly" be added to the description on the first page of the Notice.  The date range should also be revised to reflect the fact that the limitations period runs from the date conditional certification is granted, not the date Plaintiff filed his lawsuit.

The class list should also run from the date conditional certification is granted, not the date Plaintiff filed his lawsuit. There is also currently no basis for Plaintiff's request for the dates of birth or telephone numbers off potential opt-ins, which Generac asserts is confidential information.  If a notice is returned undeliverable, Defendant can provide additional information regarding the addressee as needed to facilitate delivery.

## C.    The Placement of the "Disclaimer" Regarding the Court's Position.

Defendant objects to the location of the "disclaimer" advising Notice recipients that the Court has not yet expressed an opinion on the merits.  As currently placed, it is an afterthought that could easily be overlooked by potential opt-ins.  If this matter is conditionally certified, and Notice is issued to any individuals, Defendant believes the disclaimer should be placed in a more prominent location, such as directly before the "Introduction" section of the Notice.

## D.    The 60-day Deadline and "Mailbox Rule."

"There is no indication why 45 days, an opt-in period ordered by other courts in FLSA actions, would not be sufficient time under these circumstances." *DeKeyser v. Thyssenkrupp*

*Waupaca, Inc.*, 2008 WL 5263750, at *6 (E.D. Wis. Dec. 18, 2008); *see also Miller v. ThedaCare, Inc.*, 2016 WL 4532124, at *9.

Defendant further objects to the suggestion that the Consent to Join Form need only be timely postmarked for potential opt-ins to participate. Consistent with the express terms of the statute authorizing collective actions, consent forms must be filed with the court before an individual can join. *See* 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."); *see also Harkins v. Riverboat Services, Inc.*, 385 F.3d 1099, 1101 (7th Cir. 2004) ("The statute is unambiguous: if you haven't given your written consent to join the suit, or if you have but it hasn't been filed with the court, you're not a party.")

### E.    Delivery and Display of the Notice.

There is no basis for Plaintiff's request to display notice at Defendant's facilities. First-class mail is the prevailing method and there is no indication it will be ineffective here. *See, e.g., DeKeyser v. Thyssenkrupp Waupaca, Inc.*, 2008 WL 5263750, at *6 (E.D. Wis. Dec. 18, 2008) (unpublished) ("Because it is unclear why transmitting the noticed by first class mail and publishing it through newspapers would be insufficient, I will not order [the employer] to post the notice in its plants."); *Cf. Jimenez*, 2013 WL 3936928 (denying plaintiffs' request to conduct in-person meetings with putative class members) ("Accordingly, at this time, the court will only authorize the Plaintiffs to provide potential opt-in workers with the proposed notice by first-class mail.").

Instead, Defendant believes that, except with respect to ones that are returned undeliverable, Notice should only be sent once, via first-class mail. *See Miller*, 2016 WL

4532124, at *9 ("Such notice may be sent once via first class mail to the conditionally-certified class, and there will be a 45 day opt-in period following the mailing of the notices.")

## CONCLUSION

The "critical inquiry" in assessing a plaintiff's motion for conditional certification "is whether [plaintiffs] have shown that [they are] similarly situated to the potential class plaintiffs." *Adair,* 2008 WL 4224360, at *2. Plaintiffs have the obligation to produce admissible evidence to support this burden, *id.* at *8, and they have failed to do so here. The alleged policy that they claim ties them and the putative class together is their distorted interpretation of an employment policy providing grace periods, which also contains a perfectly appropriate direction to employees to obtain advance authorization before working extra hours. These lawful policies are reinforced with visual depictions on Generac's time clocks, audible buzzers in Generac's Facilities, and a direct channel for complaints to Generac's human resources and payroll professionals. Plaintiff seeks to overcome this evidence with conclusory assertions that all hourly manufacturing employees in Defendant's Wisconsin facilities violated Defendant's policies, ignored Generac's visual and audible reminders, and failed to report incidents of unpaid work.

While Plaintiffs speculate, Defendants have produced actual, and uncontested, evidence that any pay issues the three employees identified may have had, if any were the result of their own knowing policy violations made in direct contradiction to training, the employee handbook and supervisor oversight. The weaknesses of Plaintiff's request is all the more glaring when they ask the Court to conditionally certify not just their six job titles at the Oshkosh facility, but 38 different hourly manufacturing positions at five of Generac's facilities in Wisconsin, currently totaling approximately 1,250 total employees. The Court should deny Plaintiffs' motion, or in

the alternative, limit conditional certification to the Oshkosh facility only and amend the proposed notice as requested.

Dated this 11th day of June, 2018.

s/ Keith E. Kopplin
Keith E. Kopplin
WI State Bar No. 1044861

Sarah J. Platt
WI State Bar No.  1070837

Elizabeth A. Rowicki
WI State Bar No. 1065644

OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
Pabst Boiler House
1243 North 10th Street
Suite 200
Milwaukee, WI 53205
Telephone: 414.239.6400
Facsimile: 414.755.8289
keith.kopplin@ogletree.com
sarah.platt@ogletree.com
elizabeth.rowicki@ogletree.com

ATTORNEYS FOR DEFENDANT
GENERAC POWER SYSTEMS, INC.

34248605.3