UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TIMOTHY TOM, JR.,

        Plaintiff,

    v.                                        Case No. 17-C-1413

GENERAC POWER SYSTEMS, INC.,

        Defendant.

## DECISION AND ORDER

Plaintiff Timothy Tom, Jr., filed this action on behalf of himself and other similarly situated manufacturing employees throughout Wisconsin employed by Defendant Generac Power Systems, Inc. Tom alleges that Generac maintains a pay policy that violates the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. § 201 *et seq.*, by rounding manufacturing employees' start and end time to their scheduled times rather than the times that they actually clocked in or out, resulting in the alleged failure to compensate the employees for hours worked in excess of 40 during the week. This matter comes before the court on Tom's motion for conditional certification of a collective action under the FLSA and for court facilitated notice to the proposed class. ECF No. 24. Tom seeks to certify a conditional class consisting of all manufacturing employees who worked at Generac's Wisconsin facilities in Eagle, Jefferson, Oshkosh, Waukesha, and Whitewater between October 16, 2014, and October 16, 2017. In addition to Tom, ten individuals have already filed forms giving notice of their consent to join this lawsuit as plaintiffs. ECF Nos. 5, 6, 13. For the reasons stated below, Tom's motion for conditional certification and court facilitated notice will be denied.

**BACKGROUND**

Generac is a Wisconsin corporation that manufactures power products, such as residential and commercial generators, at locations in Eagle, Jefferson, Oshkosh, Waukesha, and Whitewater, Wisconsin. Compl. ¶ 2, ECF No. 1; Answer ¶ 2, ECF No. 9; *see also* ECF No. 43-1 at 4–6. At those five locations, Generac employs more than 1,200 non-exempt manufacturing employees in a variety of positions. Compl. ¶ 26; Answer ¶ 26; ECF No. 45 ¶ 4; ECF No. 44 ¶ 4; ECF No. 43 ¶ 5; ECF No. 42 ¶ 4; ECF No. 39 ¶ 8. During the three years preceding the filing of the complaint, Tom worked as a Material Handler and a Team Lead at Generac's Oshkosh facility. Compl. ¶ 15; Answer ¶ 15. In this capacity, Tom worked with other manufacturing employees to manually produce power products. ECF No. 29-4 at 4.

An employee handbook establishes the terms and conditions of employment for all of Generac's manufacturing employees. ECF No. 43-1. Under the handbook, all non-exempt manufacturing employees receive pay at 1.5 times their regular rate of pay for any hours worked in excess of forty hours in a workweek. Compl. ¶ 29; Answer ¶ 29. The handbook further provides that "[a]ll overtime for hourly and non-exempt employees must be authorized in advance by a manager." ECF No. 43-1 at 10. Although the handbook provides that employees who work overtime without prior authorization from a manager will be paid for any overtime worked, it also warns that those employees will face discipline—including possible termination—for working without prior authorization contrary to Generac's policy. *Id.* Whether during straight time or overtime, the handbook also prohibits employees from doing any work without recording their time. *Id.* If an employee believes that there has been an error in his or her pay, then the handbook dictates that the employee should contact the payroll department. *Id.* at 11. Likewise, the handbook explains

that if an employee identifies an error in his or her time reporting, such as a missed entry, it is the employee's responsibility to notify a manager immediately. *Id.* at 22. Indeed, the handbook expressly explains that "[y]ou are responsible for making sure that the correct times are collected for the purpose of paying you accurately." *Id.* at 22.

Generac tracks its manufacturing employees' hours of work using an electronic punch clock system running software created by Paper-Less, LLC. Compl. ¶ 24; Answer ¶ 24; ECF No. 35-1 at 8–9. Punch clock terminals are located at various locations throughout Generac's facilities; for example, Tom testified at his deposition that at the Oshkosh facility he used two punch clocks located on the production line and two located near the two exits to the main parking lot. ECF No. 37 ¶ 14; ECF No. 35-1 at 8–9. Using a unique employee number, each manufacturing employee uses these terminals to "clock in" and "clock out" electronically at the beginning and end of their shifts. Compl. ¶¶ 32–35; Answer ¶¶ 32–35. The Paper-Less software records the actual time that individual manufacturing employees clock in and clock out each day. *See* Compl. ¶¶ 34, 36; Answer ¶¶ 34, 36. Based on its production needs, Generac sets weekly schedules in advance for each of its hourly manufacturing employees. Compl. ¶ 41; Answer ¶ 41; ECF No. 26 ¶ 7. Each shift includes two paid rest breaks and an unpaid thirty minute meal period. ECF No. 40 ¶ 14.

Generac permits hourly manufacturing employees to punch in before the start of their shift, but it prohibits them from actually beginning to work until the shift's scheduled start time. ECF No. 43 ¶ 19; ECF No. 42 ¶ 17; ECF No. 40 ¶¶ 11, 13 19. When an employee clocks in, the computer terminal displays the current time and the time that the employee is expected to begin working; the start time displayed corresponds to the scheduled start time for the shift and is the time used for compensation purposes. ECF No. 43 ¶ 21; ECF No. 35-1 at 11. In other words, when an

employee clocks in "early," meaning during the fifty minutes prior to the scheduled start time, the clock in time for payroll purposes is automatically adjusted to the scheduled shift start time. ECF No. 29-1 at 17. (If an employee clocks in prior to this "early" start time, the system automatically adjusts the clock in time forward to the next quarter hour. ECF No. 29-1 at 14.) When an employee clocks out after the scheduled shift end time, the electronic system similarly adjusts backwards to the scheduled shift end time for payroll purposes, rather than using the later clock out time. ECF No. 29-1 at 12; ECF No. 29-2 at 6.

At each of the Generac facilities, a buzzer signals the start and end of shifts and breaks. ECF No. 40 ¶¶ 16–17; ECF No. 35-1 at 2–3. Between the time they clock in and the time the buzzer signals the beginning of a shift, manufacturing employees are permitted to socialize, attend to personal matters, and settle into their workstations, where they are expected to be ready to work when the buzzer sounds. ECF No. 43 ¶¶ 19–20; *see also* ECF No. 43-1 at 22 ("When starting bells ring, you are to be at your station ready to work."). To reiterate, however, hourly manufacturing employees are expressly prohibited from working before their shift's scheduled start time and after its scheduled end time without permission from their supervisor. ECF No. 43 ¶ 10.

Tom, opt-in plaintiff Charles Werba, and Cary Lewandowski, a non-plaintiff former manufacturing employee, all state that they performed compensable work immediately after clocking in and immediately before clocking out, even when that work occurred before or after the scheduled start or end times of their shifts. ECF No. 30 ¶ 8; ECF No. 28 ¶ 7; ECF No. 26 ¶¶ 5–6. However, Daniel Juedes, Tom's supervisor, states that he is not aware of any employee working hours without being paid and that, despite Tom bringing other matters to his attention, Tom never complained to him about problems with his timekeeping or compensation. ECF No. 40 ¶¶ 34–42. Juedes regularly

4

updates timekeeping reports in response to requests from employees informing him of errors, and he regularly approves overtime requests from employees who want to work more hours than provided for by their regularly scheduled shifts. *Id.* ¶¶ 29–32. Similarly, Nick Leick, Werba's supervisor, states that aside from one occasion in 2016 when Werba complained about not being paid for work he performed after the scheduled end of his shift, he has adjusted Werba's schedule in response to requests that he be allowed to work before his scheduled start time or after his scheduled end time. ECF No. 46 ¶¶ 34–38.

## ANALYSIS

The FLSA permits collective actions "against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). Unlike a typical class action suit under Federal Rule of Civil Procedure 23, in which unwilling plaintiffs must "opt out" of the class, a collective action under Section 216(b) of the FLSA requires employees or former employees to "opt in" to the class by providing written consent to join the collective action. *Woods v. N.Y. Life Ins. Co.*, 686 F.2d 578, 579–80 (7th Cir. 1982) (discussing differences between Rule 23 class action and FLSA collective action). To implement the opt-in procedure in an FLSA collective action, district courts may, in their discretion, facilitate notice to potential plaintiffs. *See Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989); *Woods*, 686 F.2d at 580.

"The critical inquiry in determining whether a court should exercise its discretion to authorize the sending of notice to potential plaintiffs is whether the representative plaintiff has shown that she is similarly situated to the potential class plaintiffs." *Austin v. CUNA Mut. Ins. Soc'y*, 232 F.R.D. 601, 605 (W.D. Wis. 2006). "Generally, in order to determine whether the representative plaintiff

is 'similarly situated' to potential opt-in plaintiffs, this Court follows a two-step certification approach." *Ehmann v. Pierce Mfg., Inc.*, No. 16-CV-247, 2016 WL 5957275, at *2 (E.D. Wis. Oct. 13, 2016) (citing *Adair v. Wis. Bell, Inc.*, No. 08-CV-280, 2008 WL 4224360, at *8 (E.D. Wis. Sept. 11, 2008)).

In the first stage, the court examines whether the plaintiff has demonstrated a "reasonable basis" for believing he is similarly situated to potential class members. *Miller v. ThedaCare Inc.*, No. 15-CV-506, 2016 WL 4532124, at *3 (E.D. Wis. Aug. 29, 2016). The plaintiff must make "at least a modest factual showing" that collective action is appropriate. *Adair*, 2008 WL 4224360, at *4. To establish that factual support, the plaintiff may present affidavits, declarations, deposition testimony, or other documents that "demonstrate some 'factual nexus between the plaintiff and the proposed class or a common policy that affects all the collective members.'" *Ehmann*, 2016 WL 5957275, at *2 (quoting *Nehmelman v. Penn Nat'l Gaming, Inc.*, 822 F. Supp. 2d 745, 750 (N.D. Ill. 2011)). Although the "modest factual showing" standard is lenient, it is not a "mere formality." *Adair*, 2008 WL 4224360, at *3. Indeed, the plaintiff must submit admissible evidence in order to make the required showing. *Id.* at *8. Because "a plaintiff's discovery demands upon conditional certification may impose 'a tremendous financial burden to the employer,'" courts must be careful to avoid wasting the parties' time and resources in cases that do not warrant certification. *Id.* at *4 (quoting *Woods*, 686 F.2d at 581). If the class is conditionally certified, notice may be sent to other potential class members, and discovery may proceed.

At the second step, which usually arises on the defendant's motion for decertification, the court must determine whether the plaintiffs who have opted in are, in fact, similarly situated. *Miller*, 2016 WL 4532124, at *4 (citing *Brabazon v. Aurora Health Care, Inc.*, No. 10-CV-714, 2011 WL

6

1131097, at *2 (E.D. Wis. Mar. 28, 2011)). In this phase, the court assesses whether continuing as a collective action provides efficient resolution in one proceeding of common issues of law and fact. *See Hoffman–La Roche*, 493 U.S. at 170.

Here, Tom moves for conditional certification of a collective class consisting of all current and former manufacturing employees at Generac's Eagle, Jefferson, Oshkosh, Waukesha, and Whitewater locations between October 16, 2014, and October 16, 2017. Tom argues that he is similarly situated with the other non-exempt hourly manufacturing employees because they all worked in the manufacturing process on shifts scheduled by Generac, they regularly worked more than forty hours in a week, they used the electronic timekeeping system to clock in and out before and after their shifts, they performed compensable work prior to their scheduled start times immediately after clocking in, and they performed compensable work after their scheduled stop times immediately before clocking out. He further alleges that, by automatically calculating the workday for payroll purposes based on the scheduled start and end times for the shift, Generac's electronic timekeeping system consistently failed to compensate them for work performed before and after the shift's start and end times.

Generac counters that its practice of calculating payroll based on the scheduled shift start and end times rather than actual clock in and clock out times constitutes a permissible grace period under the FLSA and its implementing regulations. Specifically, 29 C.F.R. § 785.48 provides guidance for the use of time clocks:

> (a) Differences between clock records and actual hours worked. Time clocks are not required. In those cases where time clocks are used, employees who voluntarily come in before their regular starting time or remain after their closing time, do not have to be paid for such periods provided, of course, that they do not engage in any work. Their early or late clock punching may be disregarded. Minor differences

7

between the clock records and actual hours worked cannot ordinarily be avoided, but major discrepancies should be discouraged since they raise a doubt as to the accuracy of the records of the hours actually worked.

(b) "Rounding" practices. It has been found that in some industries, particularly where time clocks are used, there has been the practice for many years of recording the employees' starting time and stopping time to the nearest 5 minutes, or to the nearest one-tenth or quarter of an hour. Presumably, this arrangement averages out so that the employees are fully compensated for all the time they actually work. For enforcement purposes this practice of computing working time will be accepted, provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked.

29 C.F.R. § 785.48(a)–(b). Unsurprisingly, Generac focuses on subsection (a)'s instruction that early and late punches may be disregarded, while Tom focuses on subsection (b)'s admonition that rounding is appropriate only when it does not result in the failure over time to pay employees for all time worked. At the conditional certification state, however, whether Generac's policies and practices actually violated the FLSA is a less pertinent question than whether the admissible evidence in the record constitutes a modest factual showing as to the existence of a nexus between Tom and the members of the proposed class with regard to Generac's alleged policies and practice. With regard to this latter question, the court concludes that Tom has not made the showing necessary to support conditional certification.

It is first important to emphasize that Generac maintains a written policy expressly prohibiting manufacturing employees from working off the clock in the manner described by Tom, and it has presented evidence indicating that it abides by those policies in practice. "Where there is evidence that employers have, and enforce, appropriate pay policies, that evidence weighs strongly against conditional certification." *Nieddu v. Lifetime Fitness, Inc.*, 977 F. Supp. 2d 686, 703 (S.D. Tex. 2013). Generac's employee handbook requires manufacturing employees to record all time worked

(whether straight time or overtime), prohibits employees from working overtime without prior approval from a supervisor, nonetheless promises to pay unapproved overtime (although with a concurrent threat of disciplinary action), and places the responsibility on employees to contact their supervisor and the payroll department if they identify errors in their punches or pay. ECF No. 43-1 at 10–11, 22. Furthermore, in opposition to the motion, Generac has submitted eleven declarations corroborating the implementation of Generac's written policies at the five manufacturing facilities, including declarations by a human resources manager from each of the five facilities (ECF Nos. 39, 42–45), a production manager and two supervisors from the Oshkosh facility (ECF Nos. 37, 40, 46), and three hourly manufacturing employees, two at the Oshkosh facility and one at the facility in Eagle (ECF Nos. 36, 38, 41).

The declarations submitted by Generac paint a broader picture of the company's payment policies than Tom describes. All three hourly manufacturing employees who submitted declarations assert familiarity with Generac's policies prohibiting work before and after the beginning and end of a shift. ECF No. 41 ¶¶ 4, 6; ECF No. 38 ¶ 4; ECF No. 36 ¶ 5. Both supervisors and the production manager from Generac's Oshkosh facility further note that they have never required any hourly manufacturing employees to work before a shift, after a shift, or during a break without compensating them, and they disclaim any awareness of employees working without authorization before or after their scheduled start or end times. ECF No. 46 ¶¶ 4, 20–21; ECF No. 40 ¶¶ 4, 20–21; ECF No. 37 ¶ 9, 22. These supervisors and the hourly manufacturing employees all note the presence of the alarm bells throughout their facilities alerting employees to the start and end times of their shifts, as well as the notice of scheduled start and end times that appears on the time clocks when employees clock in for the day. ECF No. 46 ¶ 12; ECF No. 41 ¶¶ 3, 6–7; ECF No. 40 ¶¶ 12,

16–17; ECF No. 38 ¶¶ 4, 6–7; ECF No. 37 ¶¶ 19–20; ECF No. 36 ¶¶ 4–6. And the human resources managers from each of the five facilities confirm that Generac uniformly applies its policies prohibiting unauthorized, off-the-clock work at each facility, as well as the systems such as the bells and time clock displays to communicate to hourly manufacturing employees their scheduled shifts for which they will be paid. ECF No. 45 ¶¶ 7–24; ECF No. 44 ¶¶ 7–23; ECF No. 43 ¶¶ 10–25; ECF No. 42 ¶¶ 8–24; ECF No. 39 ¶¶ 11–22.

Against this backdrop, the reason that Tom is not similarly situated to the proposed class of hourly manufacturing employees becomes clear: to the extent that Tom performed compensable work outside of his scheduled shift times—meaning between the time he clocked in and the time his shift began or between the time his shift ended and the time he clocked out—he was doing so of his own accord, without the authorization of his supervisors, and contrary to company policy. *See* ECF No. 40 ¶ 39 ("Mr. Tom never complained to me about any problems with his timekeeping or compensation for time worked at Generac."). During his deposition, Tom acknowledged his awareness of Generac's policies prohibiting working without authorization, as well as the clear means by which the company reiterates shift schedules to employees on the time clock and informs them about shift start and end times using bells that ring in the facility. ECF No. 35-1 at 5–7. He further admitted that nobody at Generac ever instructed him to work time for which he would not be compensated, that nobody instructed him to work after clocking in but before his scheduled shift start times, and that his supervisor always approved his requests to work overtime. *Id.* at 8, 13–14. Any work that Tom performed outside of his scheduled shifts thus occurred not as a product of a policy commonly affecting all hourly manufacturing employees at Generac but as a result of his own

10

decision to work during times when Generac expressly instructed him and all other employees not to perform work.

Claims that Tom, as well as fellow declarants Werba and Lewandowski, did not receive compensation as a result of their decisions to work without authorization and their failure to inform their supervisors about that work are insufficient to show that they and the members of the proposed class were victims of a common policy that deprived them of compensation. "[T]he FLSA stops short of requiring the employer to pay for work it did not know about, and had no reason to know about." *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011). The mere act of clocking in before the start of a scheduled shift does not place the employer on notice that an employee begins to work before the scheduled start time. *Id.* at 177–78; *see also* 29 C.F.R. § 785.48(a). Given that an employee's individual action clocking in early does not automatically put the employer on notice that the employee has begun to work, the act of clocking in prior to the start of a scheduled shift or after its scheduled end time cannot support a finding that the hourly manufacturing employees were subject to a common policy depriving them of compensation before and after their scheduled shift times. The mere fact that Tom, Werba, and Lewandowski claim that they each individually worked without compensation between their clock times and their scheduled shift times—or even their claims that they observed others performing such work—are insufficient to make even a modest factual showing that Generac maintains a policy that fails to compensate more than 1,200 workers for several minutes of work each shift. *See Adair*, 2008 WL 4224360, at *10 ("[A] plaintiff may not substitute her own judgment for the Court's by averring her 'understanding' that her employer had a widespread improper practice, while shielding the Court's review of her conclusion and the

sufficiency of the facts on which it is based by general assurances that it was formed by her observations and conversations with others.").

Tom argues that he satisfies the lenient standard for conditional certification because he has demonstrated that all hourly manufacturing employees at the five facilities used the same electronic timekeeping system and were subject to the same adjustment policy relying on their scheduled start and end times for calculating compensation, rather than their clock in and clock out times. But as the discussion above shows, focusing on the common electronic timekeeping system and adjustment practices fails to adequately describe Generac's policies, which also prohibit all employees from working without authorization and from failing to report any time that they work. An employee in Tom's position who properly followed Generac's policies would report any pre- or post-shift work to the employee's supervisor—although that employee might risk disciplinary consequences for working without permission. Moreover, considering the record as a whole, Tom has not made a modest factual showing to suggest that Generac engages in an unofficial practice of requiring employees to work before and after their scheduled shifts. To the contrary, the record indicates that Generac employs a number of measures—time clock reminders, bells, and supervisor reminders—to ensure that hourly manufacturing employees *do not* work before their scheduled shift start times and after their scheduled shift end times. Because the court therefore concludes that Tom's claims arise out of his individual actions and do not demonstrate a nexus between his experience and the experience of members of the proposed class, the court finds that conditional certification is not appropriate in this case.

## CONCLUSION

For the foregoing reasons, Tom's motion for conditional certification and court-facilitated notice (ECF No. 24) is **DENIED**. Because the court denies the motion for conditional certification, it is not necessary to address the parties' arguments regarding Tom's proposed notice.

Dated this <u>3rd</u> day of August, 2018.

<u>s/ William C. Griesbach</u>
William C. Griesbach, Chief Judge
United States District Court
